106 P.3d 212 (2005)
153 Wash.2d 553
In re MARRIAGE OF Margo R. LANGHAM, f/k/a Kolde, Petitioner, and
Velle J. KOLDE, Respondent.
No. 74508-1.
Supreme Court of Washington, En Banc.
Argued September 30, 2004.
Decided February 10, 2005.
*213 Patricia S. Novotny, Seattle, for Petitioner.
Charles Kenneth Wiggins, Bainbridge Island, Roberta Ellen Doyle, Seattle, for Respondent.
SANDERS, J.
Margo R. Langham (Margo) petitions from an adverse ruling in the Court of Appeals, holding that stock options are not converted until they are exercised and the resulting stock is sold. We hold that stock options, as valuable property distinct from stock, are converted when exercised. Damages are to be calculated at that date.
Velle J. Kolde (Velle) cross-petitions, seeking our determination that there is a binding stipulation between the parties. This stipulation would moot the remaining issues by giving Velle ownership of the disputed stock options long before he exercised them. But we do not find a binding stipulation, nor do we agree with Velle that the absence of a full trial for conversion abridged his rights. Accordingly, we affirm the Court of Appeals in part, reverse in part, and remand the case to the trial court for further proceedings.

FACTS[1]
The parties' marriage was dissolved on December 15, 1994. Their major asset was *214 Microsoft stock options granted to Velle in the course of his employment. These options began to vest in 1993 and continued to vest periodically, expiring after 10 years.
In April 1994, pending the dissolution, the court ordered some of the options to be exercised and the stock to be sold. The net proceeds of the sale were deposited into the trust account of Margo's attorney, who used them to pay the mortgage on the family home, the parties' attorney fees, and a counselor. The trial court awarded the home to Margo in the decree and so she received the benefit of approximately 82 percent of the April proceeds.
Seeking a just and equitable property distribution, the trial court ordered enough options exercised to pay Margo $32,082, and the remaining options, vested and unvested, to be split evenly between the parties. Because the stock options were nontransferable they remained in Velle's name, but the court restrained him from exercising Margo's options without written authorization from her.
The decree also determined how taxes were to be handled. Since Velle alone could exercise the options, they were taxable to him in the year exercised.[2] To reimburse him for this expense, he could withhold taxes at a specific rate when he exercised the options, and the parties would reconcile the exact amount during a final accounting after his tax return was filed.
Numerous stock splits over the years since the decree complicated accounting for the options. Beginning in May 1997 attorneys for both parties began corresponding to determine the number of options Margo still owned. The parties disputed whether the April 1994 sale should be split 50/50 or based on who received the benefit of the money. If the latter method is used, Margo would be charged with 82 percent of the shares sold in April 1994, thereby reducing her share of the remaining options split under the decree. Margo's attorney offered to split the April sale based on the benefit received, and sent Velle's attorney an unsigned stipulation to that effect on November 24, 1997 (with a signed cover letter). Velle's attorney agreed with the accounting and signed it, but Margo's attorney never did.
On December 19, 1997 Margo's attorney sent a signed stipulation with a cover letter stating that all outstanding issues between the parties must be settled at the same time (the parties were simultaneously negotiating taxes and day-care expenses).[3] Velle's attorney again signed the stock option stipulation but the parties never reached agreement on the other issues. Velle's attorney sent several letters to Margo's attorney trying to follow up on the purported agreement, but she never received a response. On October 19, 1998 Margo's attorney sent Velle's attorney a letter denying any agreement because the other conditions were never met and revoking the purported stipulation. Margo's attorney said she would prepare a new stipulation but never did.
On July 30, 1999 Velle exercised 3,500 options, and on August 4, 1999 he exercised 2,500 more options. Finally, on February 22, 2000 he exercised 3,435 options. Velle borrowed the money to exercise the options, and he held the stock until April-May 2000 and sold it at a substantial loss. The taxes were still calculated at the date of exercise, but Velle's net cash was substantially less.
*215 On August 1, 2001 Margo moved to enter judgment against Velle for converting her options. Velle argued that the options he had exercised were his according to the 1997 stipulation and that he had acted in good faith reliance on the stipulation. The trial court commissioner ruled in favor of Margo, finding Velle had exercised 1,924 of Margo's options in the July 30 exercise, and all of the subsequent options he exercised also belonged to Margo. The total number of shares Velle exercised belonging to Margo was 7,859. The commissioner calculated the damages based on the fair market value of the stock the moment the options were exercised, and entered judgment in that amount after subtracting the taxes due. The commissioner also awarded pre- and post-judgment interest.
Velle moved for reconsideration, which was denied on January 4, 2002, except for striking a finding of intransigence and the related attorney fees. The trial judge denied Velle's motion to revise the commissioner's order on February 1, 2002. Velle then appealed to Division One of the Court of Appeals on February 7, 2002.
In an unpublished opinion the Court of Appeals affirmed the trial court on the conversion issue, holding that no enforceable stipulation was entered but reversed on the calculation of damages. In re Marriage of Langham & Kolde, noted at 116 Wash.App. 1067, slip op. at 7, 2003 WL 21055463 (2003). The court ruled that the conversion took place when Velle sold the stock, rather than when he exercised the options. The court reasoned that the exercise of the options "did not affect Langham's right to possess the property." Id. at 9. Margo petitioned this court, seeking review of the damages issue, and Velle cross-petitioned on the stipulation issue. We granted review on May 4, 2004.

STANDARD OF REVIEW
The parties dispute the appropriate standard of review. Velle argues it should be de novo since the record is entirely documentary evidence. Margo argues for the abuse of discretion standard normally used in property settlement cases. See In re Marriage of Thompson, 97 Wash.App. 873, 877, 988 P.2d 499 (1999). Since the parties do not dispute the underlying facts but only the conclusions drawn from the facts, the correct standard is de novo since the trial court commissioner relied solely on documentary evidence and credibility is not an issue.[4]

ANALYSIS

I. Analogizing to Conversion Was Proper to Enforce the Dissolution Decree in a Motion on the Family Law Calendar
Velle argues that he was deprived of the usual protections afforded a tort defendant because this case arose as an enforcement of a dissolution decree. In a normal tort action, he would have time to answer, the opportunity for discovery, and a jury trial with the ability to cross-examine witnesses. But here he had to respond to Margo's motion to enter judgment that was placed on the family law motion calendar and decided after a brief hearing based on documentary evidence. Velle cites no authority to support his position. We find no merit in Velle's contentions since precedent establishes the trial court's authority to enter such a judgment.
"Having before it at the outset a cause cognizable in equity, the court retain[s] jurisdiction over the subject matter and the parties to be affected by its decree for all purposes  to administer justice among the *216 parties according to law or equity." Yount v. Indianola Beach Estates, Inc., 63 Wash.2d 519, 524-25, 387 P.2d 975 (1964). The superior court unquestionably has authority to enforce property settlements. RCW 26.12.010. It further has the authority to use "any suitable process or mode of proceeding" to settle disputes over which it has jurisdiction, provided no specific procedure is set forth by statute and the chosen procedure best conforms to the spirit of the law. RCW 2.28.150. Indeed, "`[w]hen the equitable jurisdiction of the court is invoked ... whatever relief the facts warrant will be granted.'" Ronken v. Bd. of County Comm'rs, 89 Wash.2d 304, 313, 572 P.2d 1 (1977) (quoting Kreger v. Hall, 70 Wash.2d 1002, 1008, 425 P.2d 638 (1967)) (alteration in original).
The trial court had jurisdiction over the subject matter and the parties via the equitable action to enforce the decree, and it properly entered judgment against Velle when he admitted the facts relevant to the tort of conversion. Velle admitted he exercised the options. He claims to have done so in good faith, but that is irrelevant: "`Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action [in conversion].'" Judkins v. Sadler-MacNeil, 61 Wash.2d 1, 4, 376 P.2d 837 (1962) (quoting Poggi v. Scott, 167 Cal. 372, 375, 139 P. 815 (1914)). Since Velle admitted he exercised the options, which did not belong to him, he admitted to converting them. Additional safeguards would have done him little good.

II. The Parties Did Not Enter a Binding Stipulation
Velle then argues attorneys for both parties entered a binding stipulation that settled accounting for the shares in 1997. If that accounting is followed, then he owned the options exercised in 1999 and 2000, defeating Margo's conversion claim. Both the trial court and the Court of Appeals rejected Velle's arguments and ruled that no stipulation took place. We agree.
RCW 2.44.010[5] and CR 2A allow attorneys to enter binding agreements on behalf of their clients. CR 2A states:
No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same.
These agreements are encouraged. See, e.g., Nguyen v. Sacred Heart Med. Ctr., 97 Wash.App. 728, 735, 987 P.2d 634 (1999). The party seeking to enforce the stipulation has the burden "to prove there is no genuine dispute regarding the existence and material terms of a settlement agreement." In re Marriage of Ferree, 71 Wash.App. 35, 41, 856 P.2d 706 (1993).
The debate surrounding the stipulation centers on the correct allocation of the April 1994 sale of options per the temporary court order. If the stipulation is binding, then 82 percent of that sale is charged to Margo, and Velle did not exercise any of her options in 1999 and 2000. If the stipulation is not binding, then Velle is liable to Margo for converting her options.
The key facts are as follows: after several months of negotiating, Margo's attorney sent Velle's attorney a letter on November 24, 1997, containing a proposed stipulation regarding the stock options. The unsigned stipulation charged Margo with 82 percent of the April sale. Velle's attorney agreed with the accounting and signed the stipulation. Velle argues these acts constitute a binding stipulation since the cover letter of Margo's attorney was signed. The cover letter simply *217 said, "I enclose a stipulation on the stock options." Clerk's Papers at 360. Velle's argument is not persuasive since Margo's attorney did not sign the stipulation, and attempting to use the signature on the letter is too attenuated.[6]
On December 19, 1997 Margo's attorney sent another letter to Velle's attorney with an identical stipulation, this time signed. The cover letter states in relevant part:
As you and I have discussed in some detail, these matters [taxes, day care expenses, and stock options] must be settled at the same time. My client is tired of responding to multiple motions, and the parties should be able to bring closure at least to these financial affairs. The judgment cannot be filed or the check cashed without resolution of the outstanding income tax issue.
CP at 193. Velle's attorney again signed the stipulation, and viewed the stock option issue as settled. The parties did not reach agreement on the other issues, however, and for that reason Margo's attorney eventually revoked the settlement offer by a letter dated October 19, 1998.
Both the trial court and the Court of Appeals rejected Velle's arguments, agreeing that the December exchange evidenced Margo's intent that all outstanding issues between the parties be settled at the same time. Because the conditions were never satisfied, the stipulation is not binding. Velle argues that this court should "liberally construe the correspondence and stipulations of counsel to find an agreement," but the facts of this case do not warrant such a finding. Velle's arguments in support of a stipulation are without merit.
Instead, the terms of the decree are clear. The decree gave Margo
7. Microsoft stock options from Grants numbered 014130 and 032927 which options have vested as of November 1, 1994, in a number equal to the following: 50% of the options remaining after the award to wife of $32,082 (net of taxes which taxes shall be paid by husband)....
....
9. 50% of the Microsoft stock options which vest following November 1, 1994 from Grants 014130 and 032927.
CP at 2-3. In the accompanying findings of fact the court found that the parties had 14,930 options from the 014130 grant at the time of the decree, which is precisely the number of options left after the April sale. The trial court intended to split the remaining options evenly between the parties. Velle thus exercised 7,859 of Margo's options in 1999 and 2000 in violation of the decree.[7]

III. Stock Options Are Property, and Are Converted When Exercised
We recently noted that "[p]recedent addressing stock options is scarce." In *218 re Marriage of Chumbley, 150 Wash.2d 1, 7, 74 P.3d 129 (2003). Despite this dearth of case law, we have discussed stock options before, and in each case have assumed they are property. See id. at 6-7, 74 P.3d 129; In re Marriage of Short, 125 Wash.2d 865, 871, 890 P.2d 12 (1995). Both Chumbley and Short addressed how to characterize stock options as separate or community property in various contexts, but in neither case did we question that stock options are in fact property. "`Property' is a term of broad significance, embracing everything that has exchangeable value, and every interest or estate which the law regards of sufficient value for judicial recognition." York v. Stone, 178 Wash. 280, 285, 34 P.2d 911 (1934) (citations omitted). Relying on this definition, the Court of Appeals has considered stock options property, defining them as "the right to buy a designated stock at a particular price for a specified period of time." In re Marriage of Harrington, 85 Wash.App. 613, 624, 935 P.2d 1357 (1997) (citing Black's Law Dictionary 986-87 (5th ed.1979)). Given the ubiquity and the importance of stock options in today's business world, there can be little doubt that stock options are property.
If stock options are property, the next question is whether they can be converted. "Conversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession." Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank, 80 Wash.App. 655, 674-75, 910 P.2d 1308 (citation omitted), review denied, 130 Wash.2d 1015, 928 P.2d 416 (1996). Velle argues that stock options are not chattels, and so cannot be converted. A chattel is "[a]n article of personal property, as distinguished from real property. A thing personal and moveable. It may refer to animate as well as inanimate property." Black's Law Dictionary 236 (6th ed.1990). A newer edition of Black's defines chattel as "[m]oveable or transferable property," and a chattel personal as a "tangible good or an intangible right (such as a patent)." Black's Law Dictionary 251 (8th ed.2004). If a patent (a governmental grant of a right) can be a chattel, then surely a stock option can be a chattel as well.
Velle also argues that Margo did not have the right to possess the options since they were nontransferable. In Eggert v. Vincent, 44 Wash.App. 851, 855, 723 P.2d 527 (1986), the Court of Appeals stated the Washington rule as requiring the plaintiff to prove either possession or the "immediate right to possession" when the property was converted. Id. In Meyers Way, however, the Court of Appeals rejected this older approach in favor of the modern view: "to maintain a conversion action, the plaintiff need only establish `some property interest in the goods allegedly converted.'" Meyers Way, 80 Wash.App. at 675, 910 P.2d 1308. The court noted that Prosser and Keeton favor the modern view, regarding the older approach as "archaic and formalistic." Id. at 675 n. 16, 910 P.2d 1308 (citing Prosser and Keeton on the Law of Torts § 15, at 90 (W. Page Keeton ed., 5th ed.1984)). Thus, in Meyers Way, the Court of Appeals found a sufficient property interest in a bank's security interest in the proceeds from a sale of sand to support an action in conversion. Id. at 675, 910 P.2d 1308; see also Valentine v. Dep't of Licensing, 77 Wash.App. 838, 847, 894 P.2d 1352 (1995) (conversion of a real estate contract and the sale proceeds).
Here the Court of Appeals applied the older approach ruling stock options are converted when the resulting stock is sold. In re Marriage of Langham & Kolde, slip op. at 9. Only then, the court reasoned, is the plaintiff deprived of the right of possession. This reasoning confuses stock options with the stock itself. Stock may be converted when it is sold, but stock options, as a right to purchase stock, disappear when the owner exercises the options and purchases the stock. Once the owner exercises the options, he has irrevocably exchanged one kind of property (stock options) for another kind of property (stock), and has lost the ability to enter the stock markets at the time of his choosing. His "range of elective action" is now limited to retaining the stock or selling it. Am. Gen. Corp. v. Cont'l Airlines Corp., 622 A.2d 1, 10 (Del.Ch.), aff'd, 620 A.2d 856, 1992 WL 426435 (Del.1992). The older approach to conversion is misguided when applied to intangible property such as stock options, for if the would-be converter held the stock after *219 exercising another's options, he would not have converted them, and the rightful owner could not sue for payment of their full value.
The modern view of conversion more readily fits the reality that stock options are valuable property and are converted when exercised by limiting the owner's available choices. We hold that some property interest in the allegedly converted goods is all that is needed to support an action in conversion. Margo had a property interest in the stock options and that is enough. Further, we hold that stock options are property and are converted when exercised. The options Velle exercised belonged to Margo. He therefore converted the options when he exercised them, not when he sold the stock.

IV. Measure of Damages
Because he objects to his actions being called "conversion,"[8] Velle argues that the appropriate measure of damages is either the value of the benefit he received, or the value of the stock on the day Margo wanted the options exercised and the stock sold. He bases his argument on this section from the Restatement (First) of Restitution:
Where a person is entitled to restitution from another because the other, without tortious conduct, has received a benefit, the measure of recovery for the benefit thus received is the value of what was received, limited, if the recipient was not at fault or was no more at fault than the claimant, to its value in advancing the purposes of the recipient [with an exception not relevant here].
Restatement (First) of Restitution § 155(1), at 611 (1937). Velle claims neither to have acted with "tortious conduct" nor to be "more at fault" than Margo, thus making this section applicable. But Velle did convert the options, and did act with tortious conduct, making this section inapplicable.
Even if the section applies, the comment undercuts his position. It states that the value of the restitution "is the market value [of the property] at the time of its receipt," id. comment c at 613, which is the time Velle exercised the options and received the stock. Another valuation is permitted if the person is neither at fault nor a tortfeasor  the value of the benefit received "if, before he learns that he is not entitled thereto, the subject matter becomes incapable of return." Id. at 614. Here, Velle knew that Margo disputed the ownership of the options because of her attorney's letter in 1998, which explicitly revoked the purported stipulation, complaining that it gave Margo too few shares. Velle was at least constructively aware that he was "not entitled" to the options, and so this measure of damages fails.
Margo argues for the standard measure of damages for conversion. "[T]he measure of damages in conversion is the value of the article converted at the time of the taking." Junkin v. Anderson, 12 Wash.2d 58, 63, 120 P.2d 548 (1941) (citation omitted). We have applied this standard to stock: "The conversion being established, the respondent was entitled to recover the value of the stock at the time of the conversion, regardless of what the property of the company may have been subsequently transferred for by the appellant." Hetrick v. Smith, 67 Wash. 664, 669, 122 P. 363 (1912) (citations omitted); see also Frisch v. Victor Indus., Inc., 51 Wash.App. 377, 381, 753 P.2d 1000 (1988) (citation omitted) ("Damages for conversion of stock are measured by the value of the stock as of the date of the wrongful transfer or refusal to transfer."). It is reasonable to apply the same standard to stock options.[9]
Velle also approves the Court of Appeals' equitable argument for its award of damages: "Family law courts function as courts of equity. *220 But the measure of damages applied by the court below bore no relation to what [Velle] actually received. Because he did not sell the stocks when he exercised the options, [Velle] did not realize the profits imputed to him by the trial court. Instead, the award must be based on the value of the stock when [Velle] sold it." In re Marriage of Langham & Kolde, slip op. at 9. While it is true that family law courts are courts of equity, we fail to see how it is inequitable to make a party pay for the tort he committed. Furthermore, Velle's loss when he sold the stock is no reason to lessen Margo's damages for her converted options. Velle converted options; therefore the damages must reflect the value of the options at the moment they were exercised. This rule harmonizes the damages award with the tax consequences, and is just.
Margo further briefs the issue of measuring damages in conversion actions when the property fluctuates in value, as stock does. We need not address that issue to resolve this case, however, because the stock here declined rapidly in value. "A person whose property is converted may recover at least its value at the time of conversion." In re Salmon Weed & Co., 53 F.2d 335, 341 (2d Cir.1931) (emphasis added). The only time fluctuation is at issue is when the property increases in value after the conversion. We leave that question for another day.
As a final note, there is some discrepancy between the trial court's numbers and those used by the parties, probably stemming from a difference between the taxes withheld and the taxes actually paid. The Court of Appeals also noted this confusion. Slip op. at 11. The decree clearly states that Margo is responsible for the income tax on her options as finally determined from Velle's tax return rather than the initial figure stated in the decree, which was only an estimate. The trial court calculated Margo's damages based on the decree's percentage rather than the actual percentage paid. The latter percentage may be higher or lower than the decree's figure, which will adjust the award (exercise price less taxes plus interest) accordingly. We do not know what the correct percentage is, and therefore remand the case to the trial court for a recalculation of damages, including interest, in light of the taxes actually paid.

CONCLUSION
The Court of Appeals is affirmed in part, reversed in part, and the case is remanded to the trial court for further proceedings.
It is so ordered.
*221 We concur: ALEXANDER, C.J., C. JOHNSON, MADSEN, BRIDGE, CHAMBERS, OWENS, FAIRHURST, JJ., and IRELAND, J.P.T.
NOTES
[1] The file in this case was sealed in the trial court by order dated August 20, 1993. The record was sealed for reasons that are not relevant to this appeal, and so we unseal those portions of the record that show the facts of this case but do not reveal the information protected by the order. The remainder of the record is to remain sealed. We direct the clerk to unseal the following pages of the Clerk's Papers: 1-3, the fifth paragraph of section 3.8 on page 4, 6-12, 16, 57-59, 112-15, 193, 195-97, 223-26, 269-70, 329-30, 360-65, 376-78, 403, 433-34, 520, 526-39, 549-50 (the clerk shall redact paragraph 2 from section 2.11), 553-61.
[2] Stock options are taxed when exercised, with the difference between the exercise price and the fair market value being ordinary income. 26 U.S.C. § 83.
[3] The specific language of the letter is:

As you and I have discussed in some detail, these matters must be settled at the same time. My client is tired of responding to multiple motions, and the parties should be able to bring closure at least to these financial affairs. The judgment cannot be filed or the check cashed without resolution of the outstanding income tax issue.
Clerk's Papers (CP) at 193.
[4] See In re Marriage of Rideout, 150 Wash.2d 337, 351, 77 P.3d 1174 (2003) (holding the substantial evidence standard applied to a contempt proceeding based solely on documentary evidence because credibility was an issue, while noting that de novo is the general rule in such situations where credibility is not an issue); Smith v. Skagit County, 75 Wash.2d 715, 718-19, 453 P.2d 832 (1969). We note the Court of Appeals applied an abuse of discretion standard, In re Marriage of Langham & Kolde, slip op. at 6, declining to follow Division Three, which reviewed a commissioner's decision de novo when based solely on documentary evidence, In re Parentage of Hilborn, 114 Wash.App. 275, 278, 58 P.3d 905 (2002). For the reasons stated, we believe de novo review is appropriate. Cf. In re Parentage of Jannot, 149 Wash.2d 123, 126, 65 P.3d 664 (2003) (holding that abuse of discretion was the proper standard when the trial court relied solely on documentary evidence in deciding whether to modify a parentage plan).
[5] The statute reads:

An attorney and counselor has authority:
(1) To bind his client in any of the proceedings in an action or special proceeding by his agreement duly made, or entered upon the minutes of the court; but the court shall disregard all agreements and stipulations in relation to the conduct of, or any of the proceedings in, an action or special proceeding unless such agreement or stipulation be made in open court, or in presence of the clerk, and entered in the minutes by him, or signed by the party against whom the same is alleged, or his attorney....
RCW 2.44.010.
[6] Margo also appears to have used the 82 percent allocation in motion papers to the court to settle the income taxes due. This motion is dated July 8, 1997, which is during the time the parties were negotiating the stipulation. Velle argues that Margo cannot now repudiate this acceptance. Accepting the allocation for income tax purposes, however, does not compel the result Velle proposes. Margo should have paid 82 percent of the income taxes on the proceeds of the April 1997 sale because she received that benefit, but that does not change the result of the decree, which split the remaining shares 50/50.
[7] Velle also raises again an argument that the Court of Appeals rejected during the original appeal from the property distribution. The decree was issued before our decision in In re Marriage of Short, 125 Wash.2d 865, 871, 890 P.2d 12 (1995), in which we set forth the time rule for characterization of unvested stock options. The trial court characterized the unvested options as community property, a conclusion that is wrong given our later holding in Short. The trial court, however, explicitly gave Margo the options regardless of their character in the effort to produce a just settlement: "The granting of unvested stock options to wife, regardless of their characterization as separate or community property, is to accomplish a fair and equitable distribution of property herein." CP at 11. The Court of Appeals ruled the unvested options were wrongly characterized but noted the options would have been divided the same way with a proper characterization. In re Marriage of M.R.K. v. V.J.K., noted at 84 Wash.App. 1080, slip op. at 9-11, 1997 WL 28538 (1997). Remand is necessary only when the characterization of the property is crucial to the distribution. In re Marriage of Shannon, 55 Wash.App. 137, 142, 777 P.2d 8 (1989). The Court of Appeals was correct.
[8] Despite his aversion to the term "conversion," Velle describes his actions using almost the precise definition of conversion: "[The question is what is the appropriate measure of damages] when one former spouse, believing in good faith that property belongs to him, exercises dominion and control over that property, but a court later rules that the property belonged to the other spouse." Answer and Cross-Petition of Velle Kolde at 15. Velle recognizes that options are property, and that he exercised control over them wrongfully, albeit in good faith. Since good faith is irrelevant in a conversion action, we find no difference between Velle's statement and the tort of conversion.
[9] Several sections from the Restatement (First) on Restitution support this rule:

Where a person is entitled to restitution from another because of an innocent conversion, the measure of recovery for the benefit thus received is, at the election of the claimant, the value of the property
(a) at the time of the conversion, or
(b) i. except to the extent that its value has been increased by the converter, its value at the time of a subsequent demand, if the converter has the property at such time, or
ii. at the time of its disposition, if the converter disposes of it.
Restatement (First) of Restitution § 154, at 608-09 (1937) (emphases added). This section applies to innocent conversion; the following section applies to willful conversion.
Where a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it.
Restatement (First) of Restitution § 151, at 598 (emphasis added).
The Court of Appeals agreed in principle with measuring damages at the point of conversion but pinpointed the conversion at the moment the stock was sold rather than the moment the options were exercised. The faulty reasoning of this rule is clearly illustrated by the present case. Velle exercised Margo's options, thereby triggering a taxable event. The value of Microsoft stock rapidly declined in value after the exercise, and Velle sold the stock for a significant loss. If the stock had been held longer and the value had declined further, Margo would have owed Velle more money for taxes than she would have received from the sale of the stock. Under the Court of Appeals' rule, Margo would recover the value of the stock when it was sold but would still be liable to pay taxes on its their value when the options were exercised. Such a rule makes little sense.
Additionally, that rule permits further mischief. Velle borrowed money to exercise the options, and so the interest he paid on the loan decreased the net recovery when the stock was sold. Since Velle had to pay interest that reduced the transaction's benefit to him, he believes Margo should bear this cost. This is balderdash. Borrowing money to convert another's property and then charging that person for the cost of conversion is a bold move indeed, and should not be rewarded.