2015 OCT 19 AM 8: 54


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 72800-8-I |
| | ) | |
| SOHRAB MOSHIRI, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| DELTA Y. MOSHIRI, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 19, 2015 |
| | ) | |

LEACH, J. — Delta Moshiri appeals a postdecree order in a dissolution proceeding with her ex-husband, Sohrab Moshiri.[1]  In the divorce, the court awarded Sohrab a Bellevue office building previously owned by the couple.  In March 2011, Sohrab sent a check for $30,000 to Delta.  Sohrab says he loaned Delta this money; Delta says she cannot remember if it was a loan or partial payment on one of Sohrab's debts to her.  The same year, Sohrab defaulted on equalization payments he owed Delta.  The two signed a postdecree agreement (PDA) in which Sohrab transferred to Delta a 7.5 percent interest in the Bellevue building.  Soon after, the two signed a tenancy in common agreement (TCA) defining their interests in the building.  The TCA made Sohrab responsible for all liens on the property and provided that when the co-owners sold the building,

---

[1] We refer to the parties by their first names for clarity.

they would receive their pro rata shares of the sale's net proceeds. Sohrab sold the building in July 2014. He and Delta disagreed about the distribution of the sale proceeds.

Sohrab filed a motion in the dissolution action to settle both disputes. The trial court rejected Delta's procedural challenges and ruled in Sohrab's favor. Because we find Delta's challenges to the trial court's procedures unpersuasive, we affirm.

## FACTS

Sohrab and Delta Moshiri divorced in 2009 after 34 years of marriage. At the time, Sohrab earned $627,000 per year as an oral surgeon. Delta worked as an office manager at Sohrab's office, had "minimal computer skills," and had an earning capacity no more than $41,000 per year.

After a four-day trial in December 2008, the court divided the $14 million marital estate equally. The January 2009 decree of dissolution awarded Sohrab an office building located at 10232 NE 10th Street in Bellevue, Washington. The court valued the building at $6,360,000 gross and $5,360,405 net.

The decree awarded Delta numerous pieces of real property and three equalizing cash payments from Sohrab of $1,099,899, $347,549, and $471,254. These payments were "evidenced by . . . promissory note[s] and secured by a . . . deed of trust on the Bellevue building." The decree also required Sohrab to

pay Delta spousal maintenance of $6,000 per month for 92 months, until September 2016. The parties could modify this maintenance obligation on a showing of a substantial change in circumstances.[2]

After the divorce, the recession devastated Sohrab's business. The loss of a government contract caused him to close his practices in Snohomish and Renton and downscale his Bellevue practice. In 2010 he took on work requiring travel. Between 2011 and 2013 he sold most of his properties. Still, in March 2011, Sohrab delivered to Delta a $30,000 check to help with her medical expenses. In October 2012, Sohrab moved to California for a new job. But the job fell through, and he found himself unemployed in early 2013.

During this time, Sohrab defaulted on his payments on the combined $1,918,702 he owed Delta. The parties negotiated a PDA in July 2011. In the PDA, Delta agreed to extend the term of the largest note to July 1, 2018, and not foreclose on the Bellevue building. In exchange, Sohrab granted Delta a 7.5 percent interest in the building and agreed to make his spousal maintenance obligation nonmodifiable. The PDA requires that the interest in the Bellevue building be "evidenced by a Quit Claim Deed in the form of Exhibit A and a Tenant in Common Agreement [sic] in the form of Exhibit B." The PDA also

---

[2] RCW 26.09.170.

includes a binding arbitration clause for disputes arising "out of or in relation to this Agreement."

The parties also executed a TCA in July 2011. The TCA established the terms of Delta's 7.5 percent interest in the Bellevue building. The TCA gave Sohrab the use of the building and any net income from it and required him to pay property taxes, insurance, and assessments, and for maintenance and improvements to the property. The TCA also provided that Sohrab would "be solely responsible for any indebtedness secured by a lien on the Property" and that he could use the property to refinance existing indebtedness or obtain a loan to make improvements. Delta would "not be responsible to personally pay any loan secured by a lien on the Property, but agree[d] to consent to encumber her [7.5 percent] interest to secure a bona fide loan to Sohrab" for those purposes. A clause titled "Sale of Property" provided, "If Sohrab Moshirir [sic] decides to sell the property, Delta Moshiri's interest shall be sold as well," and

> the proceeds from the sale of the Property shall be applied first to the costs of sale including, but not limited to, real estate commissions, prorated taxes, excise tax, title insurance, and required work orders . . . and to pay off any liens on the Property not assumed by the purchaser. The remainder of the sale proceeds ("Net Proceeds"), if any, shall be distributed to the Co-Owners in accordance with their pro rata interest in the Property.

The TCA did not include an arbitration clause and provided that "[v]enue shall lie in King County." Like the PDA, the TCA provided for attorney fees to

-4-

"the substantially prevailing party" in "any suit or other proceeding . . . arising out of or pertaining to" the TCA or the Bellevue building. Each agreement contained an integration clause.

Sohrab eventually sold the Bellevue building on July 3, 2014, for $6.1 million. The "payoff loan(s)" described in the settlement statement included an $870,379 mortgage. Sohrab had reduced this mortgage balance from nearly $1 million at divorce. Delta and Sohrab agreed that they shared responsibility for paying closing costs, including sales commissions, title insurance, and excise tax. But the parties differed over whether Delta would share in other amounts paid at closing, including the mortgage balance and property tax liens. Delta contended she was entitled to 7.5 percent of the adjusted gross proceeds from the sale, approximately $435,000. Sohrab, meanwhile, contended that with the exception of a lien for his own attorney fees, Delta shared in paying all liens on the building existing before she acquired her pro rata share, resulting in about $365,000 payable to Delta.

In September 2014, Sohrab filed a motion in the dissolution action, asking the trial court to enforce the TCA as Sohrab interpreted it. In the same motion, Sohrab also asked the court to order Delta to pay back the $30,000 loan he contended he made to Delta in March 2011. Lastly, Sohrab asked the trial court to award him attorney fees under the TCA's provision as a "prevailing party."

In the trial court's October 21, 2014, order, and over numerous procedural arguments by Delta, the court found Delta's 7.5 percent interest "is a 'net' not 'gross' interest," so her share would "not be calculated until all of the property's mortgage and liens have been taken into account." The trial court also ruled that "[n]ow that Ms. Moshiri has received building sale proceeds and is able to pay, she shall repay Mr. Moshiri the $30,000 that he loaned to her." Lastly, the court awarded attorney fees to Sohrab.

Delta filed a motion for reconsideration in October 2014, which the trial court denied. She appeals.

## STANDARD OF REVIEW

A family court can use "'any suitable process or mode of proceeding' to settle disputes over which it has jurisdiction, provided no specific procedure is set forth by statute and the chosen procedure best conforms to the spirit of the law."[3] Where the family court relies only on documentary evidence to make its decision, we review it de novo.[4] Arbitrability of claims, interpretation of contracts, and application of statutes of limitations present questions of law we review de novo.[5]

---

[3] In re Marriage of Langham, 153 Wn.2d 553, 560, 106 P.3d 212 (2005) (quoting RCW 2.28.150).

[4] Langham, 153 Wn. App. at 559 & n.4.

[5] RCW 7.04A.060(2); Kamaya Co. v. Am. Prop. Consultants, Ltd., 91 Wn. App. 703, 713, 959 P.2d 1140 (1998); Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 712, 334 P.3d 116 (2014); Woodward v. Taylor, 185 Wn. App. 1, 6, 340 P.3d 869 (2014), review granted, 183 Wn.2d 1001 (2015).

ANALYSIS

Scope of Arbitration Clause

Delta first contends that the PDA required arbitration to resolve the parties' conflicting interpretations of the TCA. But Sohrab responds that the PDA's arbitration clause does not apply because the TCA is "a document separate and apart from the PDA." Contract disputes are generally arbitrable "unless the court can say with positive assurance that no interpretation of the arbitration clause could cover the particular dispute."[6] The party seeking to avoid arbitration bears the burden of proof.[7] And an arbitration clause encompassing controversies both "relating to" and "arising out of" the contract has an especially broad scope.[8]

Delta contends that the interpretation of the TCA "arises . . . out of or in relation to" the PDA and thus should be decided by arbitration. She points out that section 7 of the PDA references the TCA as an exhibit and "use[s] [the TCA] to define the scope of [Delta's] interest in the Bellevue Property granted per the terms of the [PDA]." This means that any dispute over Delta's interest in the Bellevue building "necessarily relates to the [PDA]," and, Delta asserts, the trial court should have ordered arbitration.

---

[6] Stein v. Geonerco, Inc., 105 Wn. App. 41, 46, 17 P.3d 1266 (2001).
[7] Townsend v. Quadrant Corp., 153 Wn. App. 870, 878, 224 P.3d 818 (2009), aff'd on other grounds, 173 Wn.2d 451, 268 P.3d 917 (2012).
[8] Townsend, 153 Wn. App. at 887.

Delta relies on <u>Townsend v. Quadrant Corp.</u>,[9] where this court held that an arbitration clause covered the plaintiffs' tort claims. In that case, four married couples purchased houses from the defendant.[10] Each couple signed a purchase and sale agreement, providing that "'[a]ny controversy or claim arising out of or relating to this Agreement, any claimed breach of this Agreement, or any claimed defect relating to the Property . . . shall be determined by arbitration.'"[11] The couples then sued "for fraud, outrage, violation of the CPA [Consumer Protection Act, chapter 19.86 RCW], negligence, negligent misrepresentation, rescission, breach of warranty, and a declaration of the unenforceability of the arbitration clause contained in" the agreements.[12] The court held that under the arbitration clause's language and in light of the broad policy favoring arbitration, the clause applied to the plaintiffs' tort claims.[13]

Sohrab contends that because the dispute arose out of the TCA, not the PDA, no arbitration is required. He notes that the TCA did not contain an arbitration clause as the PDA did.

---

[9] 153 Wn. App. 870, 875, 224 P.3d 818 (2009), <u>aff'd on other grounds</u>, 173 Wn.2d 451, 268 P.3d 917 (2012).
[10] <u>Townsend</u>, 153 Wn. App. at 875-76.
[11] <u>Townsend</u>, 153 Wn. App. at 877.
[12] <u>Townsend</u>, 153 Wn. App. at 876.
[13] <u>Townsend</u>, 153 Wn. App. at 887.

Where multiple instruments are part of one transaction, we read them together, construing each with reference to the others.[14] To determine whether two agreements are part of one transaction, we look to "the intention of the parties as evidenced by the agreements."[15]

Here, the PDA and TCA show that Delta and Sohrab intended to make separate agreements. Although, as Delta points out, the PDA referred to the TCA in its own section 7,[16] the PDA contained no language incorporating the TCA. Instead, the PDA provided only that Delta receive a 7.5 percent interest in the building, a fact not in dispute. The dispute about whether Delta's share was a "net" or "gross" share neither arises out of nor relates to the PDA.

The agreements' integration clauses further show that the TCA and PDA are separate. The TCA provided, "This Agreement sets forth the entire agreement between Co-Owners and all agreements . . . between the Co-Owners with regard to the Tenancy are contained herein." The PDA contained a similar provision.[17] By their plain language, then, the agreements state the parties' intent to make two separate agreements.

---

[14] Boyd v. Davis, 127 Wn.2d 256, 261, 897 P.2d 1239 (1995) (quoting Levinson v. Linderman, 51 Wn.2d 855, 859, 322 P.2d 863 (1958)).

[15] Boyd, 127 Wn.2d at 261.

[16] Section 7 of the PDA reads, "Such interest shall be evidenced by . . . a Tenant in Common Agreement [sic] in the form of Exhibit B".

[17] Section 10 of the PDA reads, "This Agreement contains the entire agreement of the parties with regard to the subject matter hereof."

Thus, despite its breadth, the policy favoring arbitration does not apply here. While in <u>Townsend</u> this court held that the agreements to arbitrate applied to the plaintiffs' tort claims because those torts arose out of or related to the agreements the plaintiffs signed, Delta seeks to apply the arbitration clause of one agreement to a dispute over the interpretation of a separate agreement governing a separate transaction.

Because the PDA and TCA are separate agreements, we "can say with positive assurance that no interpretation of the arbitration clause [of the PDA] could cover the . . . dispute" over the interpretation of the TCA.[18] We therefore hold that the arbitration clause in the PDA does not compel arbitration in the dispute over the TCA.

Pleading Requirement

Next, Delta contends that the trial court should not have considered Sohrab's claims because he did not raise them in a "pleading."

Delta contends that Sohrab was required to assert his claims about the $30,000 loan and the interpretation of the TCA in a pleading and that Sohrab's motion was not a pleading. She further contends that because Sohrab's motion allowed for only a 6-day response time, it denied her the 20-day period permitted by the Civil Rules to answer a complaint and raise affirmative defenses and also

---

[18] <u>Stein</u>, 105 Wn. App. at 46.

-10-

denied her prehearing discovery. She contends that this prejudiced her for two reasons. First, with more time, she would have been able to "reconstruct[ ] records" to determine "whether and to what extent the payment of $30,000 was a loan." And, second, she would have had more time to present extrinsic evidence to "contravene[ ] the inconsistent interpretation that was *created* by the trial court's ruling."

Sohrab responds that he does not need to commence a new action because the trial court had continuing jurisdiction. He also contends that, in any case, his motion satisfied CR 8(a)'s requirements for a pleading.

The trial court has jurisdiction over family matters, including dissolutions, as a "family court."[19] "Even after a decree of dissolution, the superior court acting as family court has authority to resolve disputes between former spouses."[20] "'[T]he court retain[s] jurisdiction over the subject matter and the parties to be affected by its decree for all purposes—to administer justice among the parties according to law or equity.'"[21] In doing so, a family court can use "'any suitable

---

[19] RCW 26.12.010.

[20] In re Marriage of Newlon, 167 Wn. App. 195, 203-04, 272 P.3d 903 (2012).

[21] Langham, 153 Wn.2d at 560 (second alteration in original) (quoting Yount v. Indianola Beach Estates, Inc., 63 Wn.2d 519, 524-25, 387 P.2d 975 (1964)).

process or mode of proceeding'" so long as "no specific procedure is set forth by statute and the chosen procedure best conforms to the spirit of the law."[22]

A family court can decide disputes between ex-spouses on a motion many years after a court has entered a decree of dissolution and without either party filing a complaint.[23] In In re Marriage of Newlon,[24] Division Three of this court held that the trial court retained jurisdiction over a dispute between the ex-spouses eight years after it entered a decree of dissolution. The parties disagreed over the disposition of the remains of their son, and the trial court ruled for the ex-wife.[25] On appeal, the ex-husband contended that the trial court lacked jurisdiction because "no 'petition, application, complaint or motion was ever filed to "commence" any interment action.'"[26] Division Three held that "[n]one was necessary" because the "court had continuing jurisdiction to resolve just this kind of dispute."[27]

Likewise, in Langham, the Supreme Court affirmed the trial court's authority to decide a dispute between ex-spouses on a party's motion and without a new complaint being filed.[28] In that case, the ex-wife moved for a

---

[22] Langham, 153 Wn.2d at 560 (quoting RCW 2.28.150).
[23] See Newlon, 167 Wn. App. at 203-04.
[24] 167 Wn. App. 195, 205, 272 P.3d 903 (2012).
[25] Newlon, 167 Wn. App. at 198.
[26] Newlon, 167 Wn. App. at 203.
[27] Newlon, 167 Wn. App. at 205.
[28] Langham, 153 Wn.2d at 560.

judgment of conversion against the ex-husband for exercising stock options that the decree of dissolution ordered him to hold in trust for the ex-wife.[29] As this court noted in Newlon, the Langham court held that the parties "treated the dispute as a motion in the dissolution proceeding, as they were privileged to do."[30] The court affirmed the trial court's authority to enter the judgment. It rejected the ex-husband's argument "that he was deprived of the usual protections afforded a tort defendant," such as "time to answer, the opportunity for discovery, and a jury trial with the ability to cross-examine witnesses."[31] The Supreme Court found that "[a]dditional safeguards would have done [the ex-husband] little good" because he had admitted the facts necessary to find conversion.[32]

Sohrab cites Newlon and Langham to show he did not need to commence a new action to resolve the dispute over the distribution of proceeds from the Bellevue building sale but could instead file a motion in the parties' existing dissolution proceeding. Delta replies that these cases' factual differences distinguish them. But Delta cites no case where a court has found that a trial court lacked authority over a postdissolution dispute between former spouses. Newlon and Langham indicate broad, continuing authority for a family court even

---

[29] Langham, 153 Wn.2d at 558.
[30] Newlon, 167 Wn. App. at 205.
[31] Langham, 153 Wn.2d at 559-60.
[32] Langham, 153 Wn.2d at 560.

years after a dissolution.[33] And the factual distinctions Delta identifies do not narrow those cases' application here, as the cases themselves suggest no such limitations. There, as here, "the superior court had entered a decree and the parties had a postdecree dispute not contemplated by statute."[34] There, as here, the appellants asserted that the trial court lacked authority to act because no complaint was filed to commence the particular action.[35] "Rather than filing a new action," the parties in those cases "treated the dispute as a motion in the dissolution proceeding, as they were privileged to do."[36] The same rule applies here. We hold that the trial court had continuing authority to act. Sohrab was not required to file a "pleading" or seek leave to amend his original pleading in the dissolution action to bring his claims.

Because no pleading was required, we need not reach whether Sohrab's motion satisfied the pleading requirements of CR 7(b) or CR 8(a) or whether the lack of procedure prejudiced Delta.

Statute of Limitations

Delta next asserts that the three-year statute of limitations on oral contracts bars Sohrab's claim on the alleged $30,000 loan.[37] This is an

---

[33] Newlon, 167 Wn. App. at 205; Langham, 153 Wn.2d at 560.
[34] Newlon, 167 Wn. App. at 205.
[35] Newlon, 167 Wn. App. at 203.
[36] Newlon, 167 Wn. App. at 205.
[37] RCW 4.16.080(3).

-14-

affirmative defense, and Delta had the burden of pleading and proving facts to support it.[38]

An oral loan agreement that does not specify a time or period for repayment is a demand loan.[39] The statute of limitations on actions for repayment of demand loans "does not commence running until notice is given or demand is made, or until a reasonable time has elapsed."[40]

Delta did not present any evidence showing either that the alleged loan had a specified repayment date (in which case it would not be a demand loan) or that Sohrab demanded repayment more than three years before he filed his motion. Thus, Delta has not shown a genuine factual dispute about this affirmative defense warranting an evidentiary hearing. The statute of limitations does not bar Sohrab's claim for repayment.

Summary Judgment

Next, Delta contends the challenged trial court order constituted summary judgment. Thus, she contends, the trial court erred because it did not observe the procedure for summary judgment motions and issues of material fact precluded summary judgment for both claims.

---

[38] Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 143 Wn. App. 345, 356-57, 177 P.3d 755 (2008).

[39] Nilson v. Castle Rock Sch. Dist., 88 Wn. App. 627, 630, 945 P.2d 765 (1997).

[40] Nilson, 88 Wn. App. at 630 (quoting Hopper v. Hemphill, 19 Wn. App. 334, 335, 575 P.2d 746 (1978)).

A trial court with authority to enforce a property settlement also has "the authority to use 'any suitable process or mode of proceeding' to settle disputes."[41] Summary judgment is proper "only when there are no disputed issues of material fact."[42] In reviewing summary judgment, "[a]ll facts and reasonable inferences are considered in a light most favorable to the nonmoving party, while all questions of law are reviewed de novo."[43]

Because the trial court had authority to enforce the PDA and the TCA, it could also "use 'any suitable process or mode of proceeding' to settle disputes" over those agreements.[44] In Langham, the Supreme Court rejected an argument similar to Delta's, finding that "the usual protections afforded a tort defendant" would have "done [the appellant] little good" because he had admitted the relevant facts.[45] Likewise, Delta does not point to any evidence to indicate that additional procedures would have helped her. "[E]rror without prejudice is not

---

[41] Langham, 153 Wn.2d at 560 (quoting RCW 2.28.150).

[42] Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co., 165 Wn.2d 679, 685, 202 P.3d 924 (2009).

[43] Wash. State Major League Baseball Stadium Pub. Facilities Dist., 165 Wn.2d at 685.

[44] Langham, 153 Wn.2d at 560 (quoting RCW 2.28.150).

[45] Langham, 153 Wn.2d at 559-60. Delta contends that unlike the appellant in Langham, she did not admit her liability for the $30,000 loan. Although Delta's lawyer admitted her liability in an e-mail, Delta contends that the admission was inadmissible under ER 408 as part of a settlement negotiation. But Delta failed to preserve this alleged error by raising it at the trial court level, so we decline to consider it here. RAP 2.5(a).

grounds for reversal."[46] As Sohrab points out, when he filed his motion, Delta had been participating for two months in discussions about whether her interest in the Bellevue building would be taken from the "net" or "gross" proceeds. We find Delta's claim that she "would need to reconstruct [her] records" of the $30,000 payment equally unconvincing. As Sohrab notes, she had a month to file her motion for reconsideration, and during that time she did not take steps toward presenting evidence that she did not receive the funds or did not borrow them. Therefore, the trial court did not err in considering Sohrab's motion for reimbursement without the notice required by CR 56(c) and without oral argument.

Because the trial court had "the authority to use any suitable process or mode of proceeding" to settle the disputes over the TCA's interpretation and the $30,000 loan and because Delta has not shown any prejudice that resulted from the failure to follow summary judgment procedure, we affirm. To defend against a motion for summary judgment, Delta needed to show evidence creating a material factual dispute or request a continuance so she could gather that evidence.[47] Since she made no effort to do either, Delta cannot now contest the

---

[46] Thomas v. French, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983).
[47] Should it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit

trial court's decision judgment based on evidence she took no steps to obtain or submit.[48]

Attorney Fees

Both parties request attorney fees under RAP 18.1. The PDA provides, "If any party hereto brings suit to enforce its rights under this Agreement . . . , the prevailing party shall be entitled to recover from the other party the costs and expenses, including attorneys' fees, incurred in such suit or on appeal." The TCA similarly provides for attorney fees for the "prevailing party," including on appeal. As the substantially prevailing party, Sohrab is entitled to his attorney fees and costs in defending this appeal.

## CONCLUSION

Because the arbitration clause in the PDA did not apply to the parties' dispute about the TCA's meaning and because the trial court had continuing authority in the parties' dissolution action to decide new disputes on a party's motion, we affirm the trial court. Sohrab is awarded reasonable attorney fees

---

affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
Former CR 56(f) (1993).
    [48] See Guile v. Ballard Cmty. Hosp., 70 Wn. App. 18, 24, 851 P.2d 689 (1993).

and costs incurred on this appeal upon his compliance with applicable court rules.

Leach, J.

WE CONCUR:

Dwyer, J.                                    Becker, J.