# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JAMES FAIRE and ANGELA FAIRE, and the marital community thereof, | No. 79130-3-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| RICHARD ALAN FINEGOLD, | |
| Respondent. | |
| GEORGE ABRANTES, MICHAEL ST. PIERRE, RUTH BROOKS, the ESTATE OF DEBRA LONG, a/k/a DEBRA JAMES, | |
| Defendants. | FILED: November 12, 2019 |

SMITH, J. — James and Angela Faire appeal the trial court's order of summary judgment dismissing their claims against Richard Finegold. The Faires contend they have demonstrated that there are genuine issues of material fact precluding dismissal on summary judgment of their claims that Finegold participated in a conspiracy with the other defendants to harm the Faires, assaulted the Faires, intentionally inflicted severe emotional distress on the Faires, and converted personal property belonging to the Faires. The Faires also claim there are genuine issues of material fact concerning whether Finegold was

unjustly enriched because the Faires maintained and improved Finegold's real property and Finegold refused to compensate them.

We conclude that there are genuine issues of material fact precluding summary judgment on the Faires' claim that Finegold converted belongings the Faires had stored, with permission, on Finegold's land. The Faires' personal property was not returned to them when they went to Finegold's property to retrieve it, or at any time after that.

As to the Faires' other claims, we conclude that there are no genuine issues of material fact and Finegold is entitled to summary judgment. Accordingly, we affirm the dismissal of the Faires' claims for conspiracy, assault, intentional infliction of emotional distress, and unjust enrichment. We reverse the court's decision dismissing the Faires' claim for conversion and remand for further proceedings.

## BACKGROUND

This case arises from a series of interactions between the Faires, Finegold, and several of Finegold's friends and acquaintances, which culminated in a violent confrontation on June 18, 2015. All of the parties were associated, in one way or another, with Michele St. Pierre. The Faires had known Michele[1] since 2008 and Finegold, her romantic partner, since 2009. The other parties include Michele's brother, Michael St. Pierre; her two friends, Ruth Brooks and

---

[1] One of the defendants is Michael St. Pierre, the brother of Michele St. Pierre. For clarity, we refer to Michele St. Pierre as "Michele."

Debra Long; and George Abrantes, who rented a room in Michele's Stanwood home.

Michele was diagnosed with cancer in July, 2014, and in the months that followed, her friends and family came to her home to provide care and other assistance. Brooks came from Tennessee to stay with her on several occasions between August, 2014 and June, 2015. St. Pierre, Michele's brother, joined her around February, 2015. Between February and April, 2015, the Faires stayed with Michele to help care for her and maintain her home. Long helped Michele put one or two properties she owned into trusts, and she assisted Michele in drafting a new will. At some point in the spring of 2015, Long began staying at Michele's home, as well.

Two years before Michele's diagnosis, Finegold purchased property outside Tonasket, Washington, at 36 E. Sourdough Road (Sourdough property). He and Michele stayed there at times, though they did not live there after Michele became ill. In 2014, with Finegold's written permission, the Faires began storing a dump truck, a flat-bed trailer, some solar panels, industrial batteries, and other equipment at the Sourdough property. The Faires estimate the total value of their personal property stored at Sourdough to exceed $75,000. The Faires also claim that after Michele became ill, Finegold asked them to maintain the Sourdough property for him and they did so. Additionally, the Faires assert that they sought permission from Michele and Finegold to stay in the house on the Sourdough property in the autumn of 2014; Michele and Finegold gave them permission, and they lived there for a few months in late 2014.

3

The Faires state that in April 2015, they entered into negotiations with Finegold to purchase the Sourdough property. Long was asked to create lease-to-own documents once Finegold and the Faires agreed on terms. The Faires changed their minds, however, and on Friday, June 12, 2015 they purchased vehicle tabs and a trip permit so that they could retrieve the dump truck, flatbed trailer, solar panels and other equipment they had been storing on the Sourdough property.

Finegold admits he gave the Faires written permission to store some personal belongings on the Sourdough property. Finegold denies, however, the Faires' other claims involving the Sourdough property: that he discussed maintaining the Sourdough property with the Faires; that they did any maintenance or made any improvements; that he or Michele gave the Faires permission, express or implied, to stay in the house on the Sourdough property; or that there were any discussions or negotiations with the Faires about selling the property to them.

Michele died on June 15, 2018 in the early morning. At the time of her death, Finegold, Brooks, Michael St. Pierre, Abrantes, and Long were all with her in Stanwood. The Faires were not present when Michele died and did not know about her death. However, when they met Long that evening for dinner, she did not tell the Faires that Michele had died; in fact she told them Michele was still alive. The Faires told Long at this dinner that they were no longer interested in buying the Sourdough property and did not want their lease-to-own proposal to go any further.

4

When Long returned to the Stanwood home after the dinner, she reported to Finegold and the others staying there that the Faires were either already "squatting" on the Sourdough property or were intending to go there and move in as soon as the upcoming weekend. According to Brooks, Long also reported to the group that the Faires had disparaged Michele. Based on Long's assertions that the Faires were likely to go to the Sourdough property within a few days, Finegold followed her recommendation to go over to the property before the Faires did, secure it and change the door locks.

On June 17, 2015, Finegold and the other defendants went to the Sourdough property. The last time Finegold had been to the Sourdough property was in September, 2014. When the group arrived, Finegold saw that the house was locked up, there were no broken windows, and no signs of forced entry. Inside, however, Finegold found items that did not belong to him, including food, liquor, kitchen dishes and appliances, canning equipment, two computers, and some housekeeping items. The presence of an additional satellite dish and two extremely large and heavy batteries led Finegold to suspect that whoever had been there was not a short-term visitor.

Finegold suspected the Faires had been occupying the house, but he did not know how recently they had been there. Although Finegold was not inclined to call the police, Long convinced him to call 911 and to report there had been a possible break-in and someone squatting at the Sourdough property. Long coached Finegold to report a burglary, as well. Finegold reported that things belonging to other people were in his house, while some of his belongings had

5

been taken.[2] Finegold later said that he would not have called 911 had Long not talked him into it.

A sheriff's deputy came to the Sourdough property in response to the 911 call, took a statement from Finegold and looked at the items in the house that Finegold said were not his property. The deputy instructed the entire group to call the sheriff's office immediately if the Faires showed up while they were still there, so that someone from the sheriff's office could interview the Faires and investigate Finegold's squatting complaint.

The next day, June 18, 2015, the Faires drove from the west side of the Cascades to the Sourdough property. They did not know that Finegold, St. Pierre, Long and Abrantes were already at the Sourdough property. With them, driving his own truck, was Boyd McPherson, a recent acquaintance who had agreed to help the Faires retrieve their personal property from the Sourdough property.

At some point that same morning, Finegold learned from a friend of the Faires, Jody Pries, that the Faires were on their way to the Sourdough property and intended to remove their personal belongings. Pries had come to the Sourdough property to drop off some industrial batteries that belonged to the Faires so that they could collect those, as well. Once Finegold learned that the Faires were on their way over, the group discussed whether to call 911 and ask

---

[2] It is not clear from the record whether, at the time Finegold called the police on June 17, 2015, he believed anything he owned was missing from his house on the Sourdough property. When he was interviewed in October, 2016 Finegold said that several security cameras were missing, and that his toaster oven had been "removed from the kitchen." However, there were no signs that two outbuildings had been broken into and a closet containing several firearms was locked and undisturbed.

for an officer to be there when the Faires arrived. Long did not want to call 911 in advance; she wanted to wait until the Faires arrived and then call the police.

According to Brooks, Long proposed that when the Faires arrived, they be given notice that they were not welcome and that arrangements would be made for the Faires to return and remove their personal property. Abrantes, like Long, favored the idea of confronting the Faires. Abrantes had purchased a new padlock and chain, ostensibly so Finegold could lock the gate at the entrance to the property, thus preventing the Faires from coming onto the Sourdough property at all. But the padlock and chain were not used to secure the gate, because the decision had been made to let the Faires come onto the property.

Brooks was opposed to the idea of confronting the Faires. She believed it would end badly, and she preferred that the police be there before the Faires arrived to handle the situation.

Finegold claims that he did not want a confrontation with the Faires, but that both Long and Abrantes insisted that he "stand up" to the Faires. Finegold understood that Long's plan entailed holding the Faires on the property until law enforcement arrived. He later said that Abrantes and Long had been goading him into a confrontation.

The group's two cars were moved out of the driveway and into a field a short distance from the house and one of the outbuildings. Brooks and Finegold both later admitted that the cars were moved so that they would not be visible from the driveway, though neither of them said what purpose that served. In addition, Long put the two computers Finegold had found in the house in

Finegold's car. Finegold said Long wanted the computers to be available to be used as a bargaining chip to get the Faires to move off the Sourdough property.

Finegold asserts that when he saw the Faires approaching in their vehicle from a distance, he became anxious about confronting them, so he left the house through the back door and ran to a neighbor's home about an eighth of a mile away. From there, he called 911.[3] Finegold, therefore, was not at the Sourdough property when the Faires drove in, and he did not see anything that happened after they arrived. The Faires were gone by the time he returned to the Sourdough property.

The Faires drove up the drive and into the loop at the end of the driveway. As soon as James Faire stepped out of the truck, Abrantes and Long rushed toward him, and Faire realized he and his wife were being ambushed.[4] Abrantes wielded a length of heavy chain with a large padlock on the end, which he was swinging, and both Long and Abrantes were screaming at Faire. Faire retreated back into the truck.

McPherson had pulled into the drive immediately behind the Faires, and saw what occurred from a distance of 35 to 40 feet. From his perspective, James Faire was trying to drive away but was blocked: Long stood in front of the truck; Abrantes was at the driver's side, smashing the windows and side mirror with the chain and padlock; and St. Pierre ran to the rear of the truck. All three

---

[3] Finegold could have called 911 from his own telephone in the house.

[4] Because this appeal involves only Finegold, and not the other defendants, the full details of the events that occurred are of limited relevance to this appeal. This summary is based on the accounts of James Faire, McPherson, and Brooks. However, many details and differences in the accounts are omitted.

were screaming at the Faires, yelling accusations and profanities. James Faire was also hindered by huge boulders along the driveway and loop. Each time James Faire tried to either back up or move forward, he was blocked.

Brooks stood at the edge of a walkway that connected with the driveway. Abrantes had tossed her his cell phone as he ran toward the truck and told Brooks to video record what happened, but she could not get the video to work. She did not participate in confronting the Faires, and McPherson heard her say several times, "He needs notice. He needs to be given notice." Like McPherson, Brooks saw Long go in front of the truck to keep the Faires from leaving, and she saw Abrantes swinging the chain at the truck. Abrantes and St. Pierre were both yelling at the Faires.

At some point during the confrontation, Abrantes' broke the driver's side mirror. James Faire, continuing in his attempts to get around the people blocking his way, hit and severely injured Abrantes with his truck. He also struck Long with his truck, running her over and killing her.

From McPherson's perspective, it appeared the Faires was attempting to veer to the right to get around people in his way when Abrantes "just fell down in the road" near the front corner of the vehicle. After Abrantes went down, McPherson said that he could not see Long, and then suddenly he saw her under the truck. Faire kept driving off the property, and McPherson followed by a different route.

From Brooks' perspective, Long was standing in front of the truck when Abrantes smashed the mirror, and then the truck lurched forward into Long.

9

Long faltered and began to fall. The truck then ran over her. She could see Long under the truck as the truck backed up, and then the truck went forward and ran over her again and kept going. She did not have a good view of Abrantes, though she did see him fall.

The Faires and McPherson drove into Tonasket and stopped around the junction of U.S. Route 97 and State Route 20. There, the Faires called 911. James and Angela Faire were arrested and taken into custody. James Faire was charged with vehicular homicide and vehicular assault and was held in jail from June 18, 2015 until he was released on personal recognizance on February 19, 2016. Ultimately, the charges were dismissed with prejudice in July, 2018, based on prosecutorial misconduct.[5]

The Faires filed an amended complaint against Finegold, Abrantes, St. Pierre, Brooks, and the Estate of Debra Long in November 2017. Finegold filed both an answer and a motion for summary judgment on December 19, 2017. Faire filed a timely response, and after hearing oral argument the court granted Finegold's motion for summary judgment on February 5, 2018. In the order granting summary judgment, the court indicated, as required by RAP 9.12, that it relied on Finegold's Motion, the Faires' Response, and Finegold's Reply, as well as declarations of Finegold and Faire. Although the court's order does not

---

[5] The court takes judicial notice that James Faire was charged in Okanogan County Superior Court with vehicular homicide for the death of Debra Long and vehicular assault for striking George Abrantes. State v. Faire, No. 15-1-00202-1 (Okanogan County Super. Ct., Wash.), appeal dismissed, No. 36249-3-III (Ct. App. July 10, 2019). The case was dismissed with prejudice in August 2018 due to prosecutorial misconduct and a Brady violation (Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). See Findings of Fact, Conclusions of Law & Mem. Op. Granting Def.'s Mot. to Dismiss, Faire, No. 15-1-00202-1 (Okanogan County Super. Ct., Wash. Aug. 9, 2018).

identify any exhibits attached to either of the declarations, Faire's declaration includes an exhibit list indicating the declaration incorporated interview transcripts of Finegold, Brooks, McPherson, Abrantes, and St. Pierre.[6] The court did not enter findings of fact or conclusions of law. Judgment was entered on October 10, 2018.

The Faires appeal.

## DISCUSSION
### Standard of Review

On appeal from an order granting summary judgment, the standard of review is de novo, and the appellate court performs the same inquiry as the trial court. Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is appropriate when the pleadings, affidavits, and depositions establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Lybbert, 141 Wn.2d at 34. A "material fact" is one on which the outcome of the litigation depends in whole or in part. Boguch v. Landover Corp., 153 Wn. App. 595, 610, 224 P.3d 795 (2009). In determining whether a genuine issue of material fact exists, we view all facts and reasonable inferences in the light most favorable to the nonmoving party. Modumetal, Inc., v. Xtalic Corp., 4 Wn. App. 2d 810, 822, 425 P.3d 871 (2018).

A defendant may move for summary judgment by showing that there is an absence of evidence to support an essential element of the plaintiff's case.

---

[6] Not all of these pleadings and exhibits are before this court. The clerk's papers identified by the parties and submitted to the court omit transcripts of the interviews of Abrantes and St. Pierre, as well as Finegold's Reply memorandum.

11

Boguch, 153 Wn. App. at 609 (internal quotation marks and citations omitted). To avoid summary judgment, the plaintiff must make out a prima facie case concerning the essential element of the claim. Boguch, 153 Wn. App. at 609. If, at this point, the plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, then the trial court should grant the motion. Boguch, 153 Wn. App at 609 (internal quotation marks and citations omitted).

The party resisting summary judgment may not rely on the allegations in the pleadings, but must set forth specific facts by affidavit or otherwise that show a genuine issue exists. Las v. Yellow Front Stores, Inc., 66 Wn. App. 196, 198, 831 P.2d 744, 745 (1992). Bare assertions that a genuine material issue exists do not constitute facts sufficient to defeat a motion for summary judgment. SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 140, 331 P.3d 40 (2014) (citation and internal quotation marks and citation omitted). "[A]n affidavit opposing summary judgment must (1) be made on the affiant's personal knowledge, (2) be supported by facts admissible in evidence, and (3) show that the affiant is competent to testify to the matters therein." SentinelC3, 181 Wn.2d at 140; CR 56(e). To be sufficient to defeat summary judgment, a party's affidavit must present more than ultimate facts, conclusory allegations, speculative statements, opinions, or argumentative assertions. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988); Las, 66 Wn. App. at 198.

## Failure to Comply with Rules of Appellate Procedure

Finegold argues that the Faires have failed to meet their burden to set forth specific facts identified in the record showing the existence of genuine issues of material fact. Instead, Finegold asserts the Faires rely on "wild allegations, . . . conjecture, unsupported assertions, and baseless conclusions," and they have also failed to comply with RAP 10.3(a)(5), which requires appeal briefs to include references to the record for each factual statement.

The Faires, in their reply assert that their opening brief included 104 citations to the record. More to the point, the Faires also resubmitted their statement of facts with more complete citations to the record for record.

The Faires rely almost exclusively on the Declaration of James Faire and three attached exhibits, which are transcripts of unsworn interviews of Finegold, Brooks, and McPherson. The Faires refer to these transcripts as "statements against interest." A statement against interest, however, is admissible as an exception to the hearsay rule only if the witness is unavailable to testify, which the Faires have not attempted to demonstrate. ER 804(b)(3). Furthermore, the rule does not render an entire interview transcript admissible simply because some of the statements within it are against the declarant's self-interest. Only the particular statements or remarks in the interview that are meet the criteria of ER 804(b)(3) are admissible under the rule. State v. Roberts, 142 Wn.2d 471, 493-94, 14 P.3d 717 (2000) (adopting a narrow definition of "statement" for purposes of ER 804(b)(3), as held in Williamson v. United States, 512 U.S. 594, 599, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994)). The Faires have not attempted

to isolate those statements made by Brooks, and McPherson in their interviews that qualify under the appropriate application of ER 804(b)(3).

Finegold's interview transcript is admissible under a different rule. His statements are admissions by a party-opponent, which are not hearsay at all. ER 801(d)(2). But Finegold has neither raised nor argued the admissibility of the interview transcripts of Brooks and McPherson, nor does it appear from the record before us that he objected to their consideration by the trial court. For that reason, we do not exclude the interview transcripts attached to James Faire's declaration.

## Conspiracy

To establish a civil conspiracy, the Faires "must prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." All Star Gas, Inc. v. Bechard, 100 Wn. App. 732, 740, 998 P.2d 367 (2000). "Mere suspicion or commonality of interests is insufficient to prove a conspiracy." All Star Gas, 100 Wn. App. at 740 (internal quotation marks and citation omitted). If the facts and circumstances the plaintiff relies on to establish a conspiracy are as consistent with a lawful or honest purpose as with an unlawful undertaking, they are not sufficient. All Star Gas, 100 Wn. App. at 740.

The Faires claim that the facts recited by James Faire in his declaration show that Finegold conspired with Long and others to harm the Faires. They allege various objectives of the conspiracy, including wrongfully keeping the

14

Faires' personal property, which they value at $75,000; falsely reporting to the police that the Faires had broken into Finegold's house and were squatting there; and ambushing and murdering the Faires. The Faires contend that a combination of Finegold's actions in concert with the others, including making false statements to the police, moving his car to a spot where it was not visible from the driveway, and running to a neighbor's house to call the police are proof of both a secret agreement to kill the Faires and of Finegold's intent to ensure only Long and Abrantes would be held responsible for the murders. In addition, they argue that Finegold admitted his participation in the conspiracy when he conceded during his interview on October, 27, 2016 that his report to the County Sheriff was false.

Contrary to the Faires' argument, the record does not demonstrate the existence of the essential elements of conspiracy, and the Faires have failed to show there are material facts in dispute. The Faires present no evidence of that Finegold entered into an agreement to try to harm the Faires physically or to wrongfully deprive them of their property. James Faire's assertions that Finegold, Long, Brooks, St. Pierre, and Abrantes agreed to engage in a violent plot against them is complete speculation. In fact, the only citations to the record in support of the Faires' conspiracy allegations refer to James Faires' bald assertions in his own declaration. The Faires did not refer to a single page of the witness interview transcripts in support of their conspiracy claims, and James Faire has no personal knowledge on which to base the claim that Finegold agreed with anyone to cause any harm to the Faires.

To the extent the record demonstrates plans or intentions to do anything at all, it tends to show that some people, such as Brooks, heard a conversation about and therefore believed there was a plan to give the Faires some kind of notice to stay off the property, preferably with the police at the scene. The record plainly shows that Abrantes engaged in violence and attacked the Faires' truck while they were inside it. The record is silent as to whether Abrantes acted in accord with an agreement or plan, and if so, with whom.

The Faires also argue that Finegold conspired with the others to make false statements to the police about the Faires. For example, the Faires claim that Finegold called 911 and told the police there had been a break-in at the house on the Sourdough property, in spite of the absence of signs of a break-in, at Long's behest. They assert that when Finegold was interviewed in October, 2016, he admitted he had lied to the police on June 17, 2015. The Faires then argue that Finegold's admission of lying to the police is in fact an admission of his participation in the conspiracy.

The Faires do not provide a citation to the transcript of Finegold's interview in support of these claims, and they read far more into Finegold's interview than the transcript supports. When Finegold was interviewed, he did not admit to falsely reporting a break-in to the police. He said he did not think he had phrased it as a break-in; he thought he had said it was a burglary. He did admit to being coached by Long to report a burglary. Counsel for the Faires then asked Finegold if Long had coached him to say things had been taken, but when

Finegold asked to have the question repeated, counsel rephrased it as an open-ended question:

> [COUNSEL:] How did she coach you? What kinds of things did she say?
>
> [FINEGOLD:]Well, she said that -- that I needed to report it, otherwise --
>
> [COUNSEL:] To report what?
>
> [FINEGOLD:] That they had -- that their stuff was there and some of my stuff had been removed from the house.
>
> [COUNSEL:] What of your stuff had been removed?
>
> [FINEGOLD:] Well, my toaster oven had been removed from the kitchen. And I don't remember what else had been removed from the house.
>
> . . .
>
> One other thing that was missing from the house that I still haven't been able to find is security equipment. There were four security cameras, of which I've only been able to find one. I don't know why they were moved, the security cameras.

The only other admission Finegold has made about the call to the police is in his answer to the complaint, in which he states he reported a "possible break-in." And Finegold also explained that he had good reasons to call 911, considering that he had not given the Faires permission to stay in the house at the Sourdough property. Far more importantly, Finegold noted in his answer to the amended complaint that the transcript of the 911 call would speak for itself, as would any reports written by the police. The court agrees. The Faires, of course, were not present when Finegold called and then met with the police the day before the Faires arrived at the Sourdough property. James Faire cannot have personal knowledge of what Finegold reported to a 911 dispatcher, and characterizing the entire report as false does not amount to proof of a conspiracy.

17

The Faires also argue that Finegold acted in furtherance of the conspiracy by planning to run to his neighbor's house to call 911 "to leave responsibility for the deaths of [the Faires] on Long and Abrantes." This argument actually undermines the notion that the defendants shared a plan to harm the Faires. Finegold's call to 911 is at least equally consistent with Finegold not having any intent to harm the Faires as it is with Finegold intending both to harm them and to set up his friends.

The Faires rely on speculation, supposition, and conclusory statements to support their claims of conspiracy to kill them or to harm them. Construing the factual record in the light most favorable to the Faires, we find that the circumstances here are not inconsistent with a lawful or honest purpose. See, John Davis & Co., v. Cedar Glen # Four, Inc., 75 Wn.2d 214, 224, 450 P.2d 116 (1969).

Summary judgment on this claim is affirmed.

## Assault

An assault is an attempt to unlawfully use force or inflict bodily injury on another, accompanied by the apparent present ability to give effect to the attempt if not prevented. Brower v. Ackerly, 88 Wn. App. 87, 92, 943 P.2d 1141 (1997). The Faires allege that they were assaulted by Long, Abrantes, and St. Pierre, and that Finegold is liable for conspiring with the perpetrators because he (a) made a false report to the police the day before; (b) left the gate to the property unlocked; (c) moved his car to a place where it could not be seen from the driveway; and (d) ran next door to call 911 when he knew the Faires were

18

arriving.[7] The Faires contend that Finegold's actions were designed to lure them onto the property and to create an alibi for himself for the harm he anticipated would be done to the Faires.

The Faires have not made out a prima facie case of assault against Finegold. It is undisputed that Finegold was not on the Sourdough property when the Faires arrived and that he did not participate in the assault on them. The claim that Finegold lured the Faires onto the Sourdough property by leaving the gate unlocked is entirely at odds with their account of their prior unimpeded access to the property and their plan to go there to retrieve their equipment and belongings. The Faires and McPherson expected that no one else would be at the Sourdough property on June 18, 2015, and at the same time, the Faires must have known they would be able to enter the property when they arrived, just as they had on prior occasions. Thus, finding the gate unlocked could not have been a lure. If, on previous visits to the property, the Faires gained access by unlocking the gate, then finding it unlocked on June 18, 2015 would have put them on notice that others were on the property.

Finegold's decision to move the vehicles away from the driveway is as consistent with lawful purposes as with unlawful ones, and the Faires present no evidence of an unlawful purpose. The Faires further speculate when they claim that Finegold ran to his neighbor's property to call the police in order to create an alibi for himself. There is not a single fact in the record to support this allegation.

---

[7] The Faires also argue that the conspiracy to commit assault is ongoing. This contention fails for the same reasons that the conspiracy claim fails.

Viewing the facts most favorably to the Faires, the record does not support the Faires' claim that Finegold participated in the assault against them, nor does it demonstrate the existence of genuine issues of material fact.

Summary judgment on this claim is affirmed.

### Intentional Infliction of Emotional Distress

To prove outrage, the Faires must establish the following elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) the actual result of severe emotional distress to the plaintiff. Kloepfel v. Bokor, 149 Wn.2d 192, 195, 66 P.3d 630 (2003). The Faires argue that Finegold is liable to them for intentional infliction of emotional distress because he entered into a conspiracy to murder them, and took specific steps in furtherance of the conspiracy, including: making false statements to the police the day before; leaving the gate to the property unlocked; moving his car so it would not be visible from the driveway; failing to call the police when he knew the Faires were arriving; and establishing a justification for taking violent action against the Faires.

The Faires again fail to support this claim with sufficient evidence in the record. We have already addressed the conspiracy claim and concluded that it was properly dismissed. The other acts alleged, stripped of the Faires speculation and conclusory statements concerning Finegold's purposes or motives, do not meet the test of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Kloepfel,

20

149 Wn.2d at 196 (emphasis omitted) (internal quotation marks and citation omitted).

Summary judgment on this claim is affirmed.

Conversion

The Faires claim that Finegold converted their personal property that was stored, with Finegold's permission, on the Sourdough property. Conversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of the possession of it. In re Marriage of Langham, 153 Wn.2d 553, 564, 106 P.3d 212, 218 (2005) (quotation marks and citation omitted). It is a derivative of the common law action of trover, "which redressed an interference with one's interest in a chattel that was substantial enough to justify compelling the wrongdoer to pay for it as in a forced sale." Potter v. Wash. State Patrol, 165 Wn.2d 67, 78, 196 P.3d 691 (2008). A chattel is personal property, as distinguished from real property; it is property that is transferable and moveable. Langham, 153 Wn.2d at 564-65. The plaintiff need not prove the defendant's knowledge or intent to establish conversion. Judkins v. Sadler-MacNeil, 61 Wn.2d 1, 3-4, 376 P.2d 837 (1962).

The Faires contend that Finegold prevented them from retrieving their dump truck, trailer, solar panels, industrial batteries, and other equipment when they came to collect it on June 18, 2015. Finegold argues that the Faires' deprivation is self-inflicted. He claims that in August and November, 2015, he granted permission to the attorney then representing the Faires to remove the items, but neither the Faires nor their counsel took steps to collect the property.

21

Finegold also claims that in January, 2018, he declared under oath that he did not want the Faires' property and he wanted them to remove it from the Sourdough property.

There are genuine issues of material fact on the issue of conversion. Finegold's claims that he repeatedly granted permission to the Faires to collect their property are unsupported by the record. The only evidence before the court on this point is in Finegold's declaration, which he signed on October 31, 2017.[8] On the issue of conversion, Finegold's declaration indicates that he does not want the property, he wants the Faires to remove it, and he has instructed his counsel to demand that the Faires remove it.

Finegold's argument ignores the fact that when the Faires arrived to retrieve their property, they were not permitted to take it. Finegold does not deny that Pries told him the Faires were coming to collect their property on June 18, 2015. The record also tends to support that he participated in preventing the Faires from simply taking their property and leaving. For example, Finegold admitted that he knew Long intended to hold the Faires on the property until the police arrived, but there is nothing in the record that sheds light on what Finegold knew or intended would occur after the police arrived, because counsel for the Faires was not permitted to probe deeper into this issue during the interview. Further, the Faires' two computers had been moved to Finegold's vehicle in

---

[8] The second page of that document is missing from the record both here and in the Superior Court file. The text beginning on the top of page 3 suggests the missing page might have provided facts related to the conversion claim.

anticipation of the Faires' arrival, which suggests the computers might not have been returned to the Faires on demand.

Finally, there is the issue of the Faires' solar panels. During his interview, Finegold admitted that he had given the Faires permission to store the solar panels in a cottage on the Sourdough property. Finegold said that when he arrived on the property on June 17, 2015, he discovered there was a new lock on the cottage and on one other outbuilding. At that time, Finegold did not remember that he had given the Faires permission to put new locks on those two buildings. Finegold had also forgotten that the Faires had offered to send Finegold the keys, but Finegold had responded "something to the effect of don't worry about it. We'll trust you." Because he did not remember this conversation, Finegold forcibly removed the lock on the cottage with a bolt cutter. Finegold also admitted during the interview that the Faires' solar panels were no longer on the Sourdough property at all. Although he said he had not sold them and was not in the process of selling them, he offered no information about where they are and no explanation for having removed them. Cutting the lock and removing the solar panels from the Sourdough property is difficult to reconcile with Finegold's assertion that the Faires are free to retrieve their belongings any time.

The crux of Finegold's argument is that he has acted in good faith because he has twice, through third parties, granted the Faires' permission to collect their property, and because he has said he does not want it. But Finegold's good faith is not a defense to conversion. As explained in Judkins,

[N]either good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action. The plaintiff's right of redress no longer depends upon [their] showing, in any way, that the defendant did the act in question from wrongful motives, or generally speaking, even intentionally; and hence the want of such motives, or of intention, is no defense.

Judkins, 61 Wn.2d at 4.

Thus, we have rejected formulations of a good faith defense in a case where the defendant, a merchant, initially refused to return a patron's coat to him, but then did return it 16 days later, after the patron hired counsel, Demelash v. Ross Stores, Inc., 105 Wn. App. 508, 20 P.3d 447 (2001), and in a case where a landlord locked a tenant out and refused to return the tenant's personal property until he could determine who the rightful owner was, Olin v. Goehler, 39 Wn. App. 688, 694, 694 P.2d 1129 (1985). In both cases, we recognized that retention of another's property could be justified for a reasonable time to determine the rightful owner, but only if there was a valid dispute or conflicting claims of ownership. Other than in very limited cases, such as conflicting claims of ownership, the duty to return the property is absolute, and the failure to do so renders the defendant liable for damages. See, Judkins, 61 Wn.2d at 4; see also, Potter, 165 Wn.2d at 79 (holding that unlawfully impounding a vehicle may constitute conversion, in which case the vehicle owner is not obligated to pursue repossession of the vehicle, but may instead seek monetary damages for conversion).

Because there are issues of material fact on the conversion claim, summary judgment on this claim is reversed.[9]

### Unjust enrichment

The Faires claim they are entitled to damages under one or both of the theories of unjust enrichment and quantum meruit, because Finegold retained the benefit of the truck, trailer, and other equipment the Faires stored on his property, and because they performed maintenance and upkeep on the Sourdough property during the time that Michele was ill. They claim that Finegold asked them to maintain the property in his absence and promised to pay them.

"Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008). To prove unjust enrichment, three elements must be established: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. Young, 164 Wn.2d at 484.

---

[9] We express no opinion on the measure of damages, should the Faires prevail on the issue of conversion on remand. We note, because the issue may arise, that on the record before us, the Faires have not proven any damages. See, e.g., Baldwin v. Silver, 165 Wn. App. 463, 470-71, 269 P.3d 284 (2011) (holding that plaintiff failed to prove damages resulted from insurer's breach of contract and bad faith, where the plaintiff's only evidence of damages was the her own declaration asserting, without supporting receipts, invoices, or other suitable proof, that the damage to her deck was worth $10,000).

A recovery in quantum meruit is for an amount that is "as much as deserved," under an implied contract to pay compensation that is reasonable for the services rendered. Bailie Commc'ns, Ltd. v. Trend Business Sys., Inc., 61 Wn. App. 151, 159, 810 P.2d 12 (1991). The three elements of an implied contract are (1) the defendant requested work, (2) the plaintiff expected to be paid for the work, and (3) the defendant knew or should have known that the plaintiff expected to be paid for the work. Young, 164 Wn.2d at 486.

Construing the facts most favorably to the Faires, they have not demonstrated the elements of unjust enrichment. Under the doctrine, "one who receives a benefit must pay for it only if the circumstances of its receipt or retention make it unjust for him to keep the benefit without paying." Irwin Concrete, Inc. v. Sun Coast Props., Inc., 33 Wn. App. 190, 194, 653 P.2d 1331 (1982). Here, although the Faires allege they performed maintenance and made improvements, they have not identified any specific form of maintenance or improvement that was a benefit to Finegold. The same is true of their claim that Finegold has had the benefit of all the equipment the Faires stored on the property. There is no evidence that Finegold has made use of the property or received any other form of benefit from storing it.

The Faires claim for recovery under quantum meruit also fails. Even accepting that Finegold asked the Faires to maintain the property, the Faires have not documented in James Faire's declaration or in any other way what maintenance work Finegold requested, what work they performed, and why the amount due them for the work is $1,000.

26

Summary judgment on this claim is affirmed.

## SANCTIONS

Finegold did not formally move for attorney fees or sanctions, but notes in his brief that the Faires "should be sanctioned for violating the most fundamental Rules of Appellate Procedure." We presume Finegold refers to the RAP 10.3(a) violations he identified and briefed in his response. In their reply, the Faires provided more thorough citations to the record. Further, Finegold does not argue that the deficiencies in the Faires' opening brief hindered or prevented him from presenting his response, and we see no evidence that it did. Because Finegold has not dedicated a section or motion to the issue, we construe this as a request that the court impose sanctions on its own motion, and we decline to do so.

## CONCLUSION

We affirm the dismissal of the Faires' claims for conspiracy, assault, intentional infliction of emotional distress, unjust enrichment and quantum meruit. We reverse the dismissal of the Faires' claim for conversion and remand for further proceedings.

WE CONCUR:

27